## Darwin PRICE and Marilyn Price, Appellants,

v.

## AMERICAN BANK OF ST. LOUIS, et al., Respondents.

### No. 56868.

Missouri Court of Appeals,
Eastern District,
Division Four.

June 29, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 7, 1990.

Application to Transfer Denied
Sept. 11, 1990.

Roger M. Hibbits, Clayton, for appellants.

Thomas Cummings, Thomas B. Weaver, Armstrong, Teasdale, Schlafly, Davis & Dicus, St. Louis, for American Bank of St. Louis.

Peter D. Kerth, Rachelle S. Loomus, Gallop, Johnson & Neuman, St. Louis, for O.K. Novelty Co.

HAMILTON, Presiding Judge.

Appellants, Darwin Price and Marilyn Price (hereinafter the Prices), appeal a judgment declaring a $130,000 promissory note executed by the Prices in favor of Respondents, American Bank of St. Louis (hereinafter the Bank), valid and enforceable. The trial court also declared the Deed of Trust securing the note a valid and enforceable lien on the Prices' house. The trial court denied the Prices' request for a permanent injunction and dissolved the temporary injunction enjoining foreclosure. The trial court denied the Prices' claims for damages and entered judgment in favor of the Bank on its counterclaim under the promissory note. We affirm.

In 1984 Darwin Price (hereinafter Price) sought to purchase the assets of Adisco, Inc. (hereinafter Adisco), a vending machine company solely owned by Stephen Bresley (hereinafter Bresley). Price formed and was the sole shareholder of Merne, Inc. (hereinafter Merne), a company incorporated to purchase Adisco's assets. Price planned to change the corporate name back to Adisco as soon as Merne acquired the assets. Both the Bank and SBA knew of the plans to change the name.

The Small Business Administration (hereinafter SBA) rejected Merne's first application for an SBA guaranteed loan from American Bank. SBA denied the application because the owner's investment and the loan request were grossly disproportionate. Roma Hauptman (hereinafter Hauptman), a commercial loan officer at the Bank who had formerly worked for SBA, sent SBA a letter dated September 20, 1984, asking SBA to reconsider the application. In the letter Hauptman explained that a $130,000 personal real estate loan could be considered equity because the Prices' personal income was sufficient to support the loan, apart from business cash flow. The Bank handled this loan through its residential real estate loan department. Subsequently, SBA approved the application. Merne agreed to the conditions of the loan authorization, including the following condition: "Guarantors agree that there will be no transfer of corporate stock in borrower corporation without the prior written consent of Bank and SBA."

On November 16, 1984, Merne purchased all the assets of Adisco for $640,000. Merne, by its president Darwin Price, executed a promissory note for $60,000 in favor of Adisco, by its president Bresley. The collateral for the note was a security interest in the vending machines and other assets being purchased.

The Prices personally borrowed $130,000 from American Bank as a residential real estate loan in order to inject owner equity into the purchase. The $130,000 promissory note was secured by a second deed of trust on the Prices' house.

Merne obtained a $450,000 loan from American Bank evidenced by a promissory note and secured by a security interest in the vending machines and other assets being purchased. The Prices guaranteed that loan. A third deed of trust on 23 Marsally Drive, the Prices' house, and an assignment of life insurance secured the Guaranty. SBA guaranteed ninety-percent of the $450,000 loan.

On November 20, 1984, the name of the corporation was changed from Merne to Adisco. The Bank, however, filed a UCC–1 financing statement on December 11, 1984, showing the debtor as Merne.

In the spring of 1985, Darwin Price met Harvey Zelin (hereinafter Zelin) who controlled Comp–Tech Vending, Inc. (hereinafter Comp–Tech). Comp–Tech entered negotiations to buy Adisco stock. During these negotiations Hauptman and the Bank learned that Price had completed the name change.

Zelin and Price met with Hauptman and another bank officer in June, 1985. Price was seeking Bank and SBA approval for the transfer of his stock. As part of the transfer agreement, Zelin was to assume the Prices' obligations under the $450,000 note. Price also wanted release from the $130,000 loan, but Hauptman testified that the discussions of release concerned only the $450,000 guaranty. The Bank outlined conditions for its approval. SBA consented to the transfer subject to certain conditions, including: (1) the execution of a guaranty of the $450,00 Note by the parent of Comp–Tech; (2) proof that Comp–Tech and its parent were validly incorporated and in good standing; (3) execution of a guaranty of the $450,000 Note by Zelin; (4) assignment to the Bank of a $430,000 life insurance policy on Zelin's life; and (5) a pledge to the Bank and a deposit with the Bank of a $100,000 certificate of deposit.

Against the advice of his attorney, Darwin Price transferred Adisco stock to Zelin on July 1. The Bank learned of the transfer in August or September, 1985. Some, but not all of the conditions for transfer had been met. The Bank informed Darwin Price that he would not be released until Zelin met the outlined conditions. Among the conditions never met were receipt of the $430,000 life insurance policy on Zelin's life; receipt of certificates of good standing for Comp–Tech and its parent; and the deposit of the $100,000 certificate of deposit with the Bank. Between August 8 and November 7, 1985, the Bank attempted to obtain the documents necessary to complete its consent to transfer and to release the Prices, but the conditions were never performed.

Between the fall of 1985 and the fall of 1986, Comp–Tech purchased approximately $300,000 worth of vending machines that were placed on Adisco routes. Comp–Tech moved machines upon which the Bank had a lien, sending some of them to locations out of the state. Comp–Tech also replaced Adisco serial numbers and identification numbers with its own identification system.

In late 1986 Adisco went into default under the $450,000 note. The Bank notified both Price and Comp–Tech of the default. Darwin Price and Bresley entered negotiations with Otis Grief (hereinafter Grief) about the sale of Adisco to O.K. Novelty, a company solely owned by Grief. Price and Bresley took Grief to the Bank to get the balance on both loans. O.K. Novelty proposed an agreement to purchase Adisco free and clear of all liens if, after a thirty-day trial period, O.K. Novelty were satisfied with the business. The agreement was never approved by Comp–Tech.

In October, 1986 Darwin Price advised O.K. Novelty and Grief that Comp–Tech's business was deteriorating and that O.K. Novelty should take immediate possession of the business in order to protect its position as a potential purchaser. The business included much more equipment than the vending machines originally sold by Adisco.

Price and Bresley presented O.K. Novelty a list of creditors to be paid. The list included, among others, Price, Bresley, and the Bank. O.K. Novelty began making payments to the creditors identified on the list. O.K. Novelty paid Price approximately $88,000. Bresley accepted $50,000 in full satisfaction of the $60,000 note. None of the monies was paid to the Bank.

In December, 1986 Zelin disappeared. O.K. Novelty and Zelin had not agreed to O.K. Novelty's purchase of Comp–Tech's assets.

Grief met with the Bank about acquiring the Adisco assets from the Bank as a part of the Bank's exercise of its rights as a secured creditor. O.K. Novelty's inventory of the business indicated that some machines could not be identified; some had been removed from the locations indicated on the collateral list; some machines were in disrepair; and, due to obliterated serial numbers, Adisco machines could not be distinguished from Comp–Tech machines. The Bank and O.K. Novelty were unable to agree upon a basis for the purchase of the assets.

In late 1986 or early 1987, the Bank filed UCC–3 financing statement change forms to indicate the name change from Merne to Adisco and also to identify Comp–Tech as a debtor. Hauptman testified that the

amendments were made because the Bank realized assets were being moved.

On March 24, 1987, the bankruptcy court entered an Order for Relief under Chapter 7 against Comp–Tech in Kansas City. No separate petition was filed on behalf of or against Adisco. The bankruptcy court appointed a trustee of the bankruptcy.

The trustee served a demand on O.K. Novelty and Grief that no more payments were to be made to Comp–Tech or Adisco creditors. The trustee also advised O.K. Novelty that he would neither recognize any transfer of Adisco to O.K. Novelty, nor give credit toward a subsequent purchase price for any payments to creditors made by O.K. Novelty.

The trustee took the position that the Bank had no perfected security interest in Adisco's assets. The trustee commenced suit against the Bank and Aloha Leasing Division of Bennett Funding Group (hereinafter Aloha Leasing), a company claiming interest in Comp–Tech assets.

Eventually all claims were settled, with O.K. Novelty purchasing the assets of Adisco and Comp–Tech for $520,000. As part of the settlement, the Bank received $230,-000 of the sale proceeds.

The Prices tried unsuccessfully to intervene in the Comp–Tech bankruptcy litigation. After the sale to O.K. Novelty, the Prices filed objections to the sale. The bankruptcy court denied the objections, finding the Prices had failed to establish any reason why the settlement agreement should not be approved. The Prices appealed, but the appeal was dismissed for failure to assemble and submit a record on appeal.

Price filed a personal bankruptcy. As a part of that personal bankruptcy, the Bank filed a Motion for Relief from the Automatic Stay asking the court to allow it to proceed with foreclosure under the Second and Third Deeds of Trust. An order granting relief from the automatic stay issued. The bankruptcy court found that the Second and Third Deeds of Trust were enforceable.

On May 26, 1988, the circuit court issued a temporary restraining order, enjoining foreclosure. On November 15, 1988, the Prices filed a first amended petition seeking a declaratory judgment, temporary and permanent injunctions, a restraining order, a show cause order, and damages. The Prices' claim for damages was based on various theories of breach of contract and negligence. The Bank counterclaimed based upon the terms of the notes. On April 28, 1989, the trial court filed its findings of fact, conclusions of law, and judgment. The trial court ruled against the Prices on all counts of the petition, dissolved the temporary injunction, and found in favor of the Bank on its counterclaim.

■ On appeal, the Prices contend the trial court erred (1) in failing to find the Bank was negligent in perfecting its UCC lien on the equipment; (2) in failing to find that they were discharged from the loans by novation agreement; (3) in failing to find the Bank misrepresented the status of the loans to them during the period; (4) in failing to dispose of all issues because the trial court made no findings on the Grief/O.K. Novelty counterclaim; (5) in listing incorrect dates in paragraphs twelve and thirteen of its findings of fact; (6) in treating the two loans of $450,000 and $130,000, respectively, as separate transactions; (7) in finding conditions precedent to release of their obligation; (8) in failing to find that Darwin Price acted as an agent of Zelin/Comp–Tech in the negotiations with Grief/O.K. Novelty; and (9) in awarding attorney's fees. The argument section of the Prices' brief contains two additional points not raised in the Points Relied On and set forth without citation to supporting authority and without argument. We hold those points are abandoned for failure to comply with Rule 84.04. Rule 84.04(d), (e); Rule 84.13(a).

■ In court-tried cases, this Court will sustain the judgment of the trial court unless no evidence supports it; unless it is against the weight of the evidence; unless it erroneously declares the law; or unless it erroneously applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

**598**

We accept as true the evidence and permissible inferences therefrom favorable to the prevailing party and disregard contrary evidence. *Ware v. Ware,* 647 S.W.2d 582, 534 (Mo.App.1983). We also defer to the trial judge's determination even if the evidence might support a different conclusion. *Id.* Finally, we defer to the trial court's assessment of witness credibility. *Herbert v. Harl,* 757 S.W.2d 585, 587 (Mo. banc 1988).

██ The Prices cite no supporting authority for Points IV, V, VI, VIII, and IX. If a point is one for which precedent is appropriate and available, an appellant is obligated to cite supporting authority. *Thummel v. King,* 570 S.W.2d 679, 687 (Mo. banc 1978). *See also Brown v. City of St. Charles,* 643 S.W.2d 645, 646 (Mo. App.1982). The Prices neither cite authority nor explain their failure to do so. Therefore, having failed to comply with Rule 84.04(d), they have preserved nothing for review with respect to Points IV, V, VI, VIII, and IX. Furthermore, a careful review of the briefs and record indicates no manifest injustice or miscarriage of justice. Rule 84.13(c).*

██ The Prices' first point on appeal reads as follows:

The Trial Court erred in failing to find that American Bank was negligent in failing to perfect the UCC lien on the equipment thus impairing the collateral for the loans and its ultimate dimunition in value and loss and in failing to find that the Bank's subsequent efforts to properly perfect the lien 27 months later was a clear admission of the bank's responsibility and negligence.

In their petition, the Prices contended that, because the Bank failed to perfect the lien,

they should be relieved of obligation under the $450,000 guaranty, the $130,000 note, their property should be relieved of the Second and Third Deeds of Trust, and they should recover damages. The trial court entered judgment against the Prices on all counts of their petition, including Counts I, II, and VI which appear to be dependent on the Bank's failure to perfect the lien. While Hauptman testified she knew of a plan to change the name back to Adisco, she also testified that she was unaware of the actual name change until 1985, after the original UCC filing. The refiling was made in the context of the transfer of ownership of the assets to Comp–Tech. Moreover, the Trustee raised a number of issues during negotiation of a settlement with the Bank, as for example, that the Bank's lien did not cover the vending machine routes; that the machines listed on the Bank's inventory of collateral could no longer be found or identified; and that new machines not covered by the Bank lien had been brought into the system by Comp–Tech. Thus, the record does not reflect that failure to perfect the lien was the reason for settlement. Furthermore, the $130,000 note was not secured by the collateral in question and was, therefore, unaffected by any alleged failure to perfect the lien. The Prices' first point is denied.

██ The Prices contend in Point II that the trial court erred in failing to find they were discharged from the $450,000 guaranty and the $130,000 note. They assert the evidence was undisputed that a novation agreement had been reached. The trial court, however, specifically found

15. American Bank informed Darwin [Price] and Zelin that it and the SBA

---

* We find it difficult to understand why the Prices assert Point IV because, if the point were supported by the record, their appeal would be dismissed. The record indicates that O.K. Novelty presented no evidence on its counterclaim at trial, submitted no suggested findings of fact and conclusions of law on the counterclaim, and did not raise this issue in its brief on appeal. O.K. Novelty abandoned the counterclaim. *Phister v. Singer Co.,* 555 S.W.2d 353, 354 (Mo.App.1977). An error in dates as raised in Point V amounts to harmless error because it is immaterial to the merits of the action. Rule 84.13(b); *Neavill v. Klemp,* 427 S.W.2d 446, 448 (Mo.1968). Point VI has no argument section, only a reference to Point VIII. Therefore, it fails to comply with Rule 84.04(a) and (e). Point VIII challenges factual findings and witness credibility with no citation to the record. Finally, as to Point IX, the record contains sufficient evidence supporting the award of attorney's fees. Furthermore, the trial court is an expert on the reasonableness of attorney's fees. *O'Brien v. B.L.C. Ins. Co.,* 768 S.W.2d 64, 71 (Mo. banc 1989).

would consent to the transfer of the stock from Darwin [Price] to Zelin or Comp–Tech Vending and to the release of the Price Guaranty and to the release of the Third Deed of Trust if certain conditions were accomplished....

16. On August 8, 1985, some of the documents necessary to accomplish the conditions required by American Bank and the SBA ... were executed by Zelin, Comp–Tech Vending and Comp–Tech Companies.

17. However, not all of the conditions necessary to the consent to the transfer of the Merne/Adisco stock or to the release of the Price Guaranty or the Third Deed of Trust were completed.

These findings are supported by the testimony of Hauptman and by documentary evidence listing the conditions of the agreement. Point denied.

In Point III the Prices contend the trial court erred in failing to find that the Bank misrepresented the status of the loans to them during the period following negotiations to substitute Zelin/Comp–Tech for the Prices. Hauptman testified that Zelin/Comp–Tech never met all the conditions for release of the Prices. She testified that between August 8, 1985, and November 7, 1985, the Bank informed Darwin Price of the incomplete status of the documentation for the release. Furthermore, on November 7, 1985, the Bank wrote Zelin a letter listing the conditions still to be met. The Bank forwarded a copy of the letter to Darwin Price. The record thus supports the trial court's conclusion that the Bank did not misrepresent the status of the loans.

In Point VII the Prices contend the trial court erred in finding the existence of conditions precedent to their release; and, even if conditions were involved, those conditions were not communicated to them until after the agreement was reached. The Prices further contend all conditions were met. The trial court, however, had evidence before it that all the parties understood the conditions for approval of the transfer/release. The attorney who represented the Prices at the closing testified that Darwin Price went ahead with the stock transfer against his advice. Moreover, the evidence showed that both Price and Zelin received status reports from the Bank concerning those conditions that remained unmet. Point denied.

The judgment of the trial court is affirmed.

CARL R. GAERTNER and STEPHAN, JJ., concur.